UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

CARLA MAE BULTHOUSE,

    Plaintiff,                                        Hon. Janet T. Neff

v.                                                      Case No. 1:10-CV-839

COMMISSIONER OF SOCIAL
SECURITY,

    Defendant.
_____/

## REPORT AND RECOMMENDATION

This is an action pursuant to Section 205(g) of the Social Security Act, 42 U.S.C. § 405(g), to review a final decision of the Commissioner of Social Security denying Plaintiff's claim for Disability Insurance Benefits (DIB) and Supplemental Security Income (SSI) benefits under Titles II and XVI of the Social Security Act. Section 405(g) limits the Court to a review of the administrative record, and provides that if the Commissioner's decision is supported by substantial evidence, it shall be conclusive. Pursuant to 28 U.S.C. § 636(b)(1)(B), authorizing United States Magistrate Judges to submit proposed findings of fact and recommendations for disposition of social security appeals, the undersigned recommends that the Commissioner's decision be **affirmed**.

**STANDARD OF REVIEW**

The Court's jurisdiction is confined to a review of the Commissioner's decision and of the record made in the administrative hearing process. *See Willbanks v. Sec'y of Health and Human Services*, 847 F.2d 301, 303 (6th Cir. 1988). The scope of judicial review in a social security case is limited to determining whether the Commissioner applied the proper legal standards in making her decision and whether there exists in the record substantial evidence supporting that decision. *See Brainard v. Sec'y of Health and Human Services*, 889 F.2d 679, 681 (6th Cir. 1989).

The Court may not conduct a de novo review of the case, resolve evidentiary conflicts, or decide questions of credibility. *See Garner v. Heckler*, 745 F.2d 383, 387 (6th Cir. 1984). It is the Commissioner who is charged with finding the facts relevant to an application for disability benefits, and her findings are conclusive provided they are supported by substantial evidence. *See* 42 U.S.C. § 405(g). Substantial evidence is more than a scintilla, but less than a preponderance. *See Cohen v. Sec'y of Dep't of Health and Human Services*, 964 F.2d 524, 528 (6th Cir. 1992) (citations omitted). It is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. *See Richardson v. Perales*, 402 U.S. 389, 401 (1971); *Bogle v. Sullivan*, 998 F.2d 342, 347 (6th Cir. 1993). In determining the substantiality of the evidence, the Court must consider the evidence on the record as a whole and take into account whatever in the record fairly detracts from its weight. *See Richardson v. Sec'y of Health and Human Services*, 735 F.2d 962, 963 (6th Cir. 1984).

As has been widely recognized, the substantial evidence standard presupposes the existence of a zone within which the decision maker can properly rule either way, without judicial interference. *See Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986) (citation omitted). This

standard affords to the administrative decision maker considerable latitude, and indicates that a decision supported by substantial evidence will not be reversed simply because the evidence would have supported a contrary decision.  *See Bogle*, 998 F.2d at 347; *Mullen*, 800 F.2d at 545.

## PROCEDURAL POSTURE

Plaintiff was 53 years of age on the of the ALJ's decision.  (Tr. 18, 104).  Plaintiff successfully completed high school and worked previously as a housekeeper.  (Tr. 16-17).

Plaintiff applied for benefits on November 2, 2007, alleging that she had been disabled since September 30, 2007, due to a pinched nerve in her neck.  (Tr. 104-10, 122). Plaintiff's application was denied, after which time she requested a hearing before an Administrative Law Judge (ALJ).  (Tr. 41-103).  On October 22, 2009, Plaintiff appeared before ALJ Randolph Schum, with testimony being offered by Plaintiff and vocational expert, Diana Wong.  (Tr. 25-40). In a written decision dated January 15, 2010, the ALJ determined that Plaintiff was not disabled. (Tr. 9-18).  The Appeals Council declined to review the ALJ's determination, rendering it the Commissioner's final decision in the matter.  (Tr. 1-5).  Plaintiff subsequently initiated this appeal pursuant to 42 U.S.C. § 405(g), seeking judicial review of the ALJ's decision.

## RELEVANT MEDICAL HISTORY

On January 31, 2002, Plaintiff participated in an MRI examination of her cervical spine the results of which were "normal" with no evidence of disc protrusion, stenosis, neural compression, or misalignment.  (Tr. 169).  On the same day, Plaintiff also participated in an MRI

3

examination of her lumbar spine the results of which revealed "early degenerative disc changes at L3-4" with no evidence of herniation, stenosis, neural compression, or misalignment. (Tr. 169).

On February 7, 2002, Plaintiff was examined by Dr. John Visser. (Tr. 170-72). Plaintiff reported that she was experiencing "right upper extremity numbness and pain." (Tr. 170). An examination of Plaintiff's upper extremities revealed "normal" strength with "no evidence of atrophy or fasciculations." (Tr. 170). Plaintiff participated in an EMG examination the results of which revealed "no evidence of radiculopathy," a finding which Dr. Visser confirmed on examination. (Tr. 170).

On February 24, 2003, Plaintiff was examined by Dr. Larry Wahl. (Tr. 173). Plaintiff reported experiencing intermittent pain in her hand and upper extremities. (Tr. 173). An examination of Plaintiff's wrists revealed that Tinel's and Phalen's signs[1] were both positive. (Tr. 173). Plaintiff exhibited "full strength" in her upper extremities. (Tr. 173). She participated in a nerve conduction study the results of which revealed "electrical evidence of a mild median nerve dysfunction at the wrist bilaterally." (Tr. 173). Plaintiff also participated in an EMG examination the results of which revealed no evidence of polyneuropathy or cervical radiculopathy. (Tr. 173). On March 19, 2003, Plaintiff underwent carpal tunnel release surgery on her right hand. (Tr. 176).

X-rays of Plaintiff's right shoulder, taken on May 1, 2003, revealed "severe arthritic change at the glenohumeral joint with spurring and joint space narrowing." (Tr. 175). On May 1,

---

[1] Tinel's sign and Phalen's sign are performed to determine the presence of carpal tunnel syndrome. *See* Tinel's and Phalen's Tests, available at http://www.carpal-tunnel-symptoms.com/tinels-and-phalens-tests.html (last visited on February 6, 2012). Phalen's test is performed by bending the patient's wrists downwards as far as they will comfortably go and pushing the backs of the hands together. The patient should hold this position for one minute. A positive test is indicated by numbness or tingling along the median nerve distribution. Tinel's test is performed by tapping over the carpal tunnel area of the wrist with the palm up. A positive test causes tingling or paresthesia, and sometimes even a "shock type sensation," in the median nerve distribution. *Id.*

2003, Plaintiff was examined by Dr. Daniel Fett. (Tr. 180-81). Plaintiff reported that "her right shoulder had been bothering her for over a year." (Tr. 180). The results of a physical examination revealed the following:

> Evaluation of her neck demonstrates no tenderness with palpation or range of motion. Cervical Spurling's maneuvers[2] are negative. Evaluation of her right shoulder demonstrates no swelling, ecchymosis, erythema or deformity. Palpation of her shoulder demonstrates mild tenderness over the acromioclavicular joint and over the anterior acromion. She has full range of motion of her shoulder, complaining of discomfort with forward elevation greater than 120° or abduction greater than 100°. There is mild crepitance with internal and external rotation. Impingement maneuver is equivocal. Supraspinatus maneuver is tender, but no weakness is noted. Sulcus sign[3] is negative, and no glenohumeral crepitance is present.

(Tr. 180).

On October 5, 2003, Plaintiff participated in an arthrogram examination of her right shoulder the results of which were "negative...without evidence of a rotator cuff tear." (Tr. 174).

On July 5, 2006, Plaintiff was examined by Dr. Patrick Ronan. (Tr. 206-08). Plaintiff reported that she was experiencing chronic low back pain which "ranges from 8-1/2 to 9." (Tr. 206). Plaintiff reported that sitting exacerbates her pain, but that "walking is better." (Tr. 206).

---

[2] A positive Spurling's test suggests the presence of a cervical nerve root disorder. Thomas W. Woodward, M.D., and Thomas M. Best, M.D., Ph.D., *The Painful Shoulder: Part I Clinical Evaluation*, American Family Physician, May 15, 2000, *available at*, http://www.aafp.org/afp/20000515/3079.html (last visited February 6, 2012).

[3] Sulcus sign "is an examination to determine the extent and/or presence of inferior instability of the glenohumeral joint." *See Orthopedic Assessment Methods, Shoulder - Sulcus Sign*, available at http://orthoassessment.blogspot.com/2007/01/shoulder-sulcus-sign.html (last visited on February 6, 2012). The glenohumeral joint is the shoulder's "ball-and-socket joint that allows for the arm to move in a circular motion as well as movement of the arm towards and away from the body." *See Biology of the Shoulder*, *Glenohumeral Joint*, available at http://biomed.brown.edu/Courses/BI108/BI108_2004_Groups/Group01/bioghj.htm (last visited on February 6, 2012).

An examination of Plaintiff's spine was unremarkable and Trendelenburg sign[4] was negative. (Tr. 207). Plaintiff exhibited normal muscle tone and a musculoskeletal examination of her back and lower limbs revealed no evidence of muscle atrophy or bony deformity. (Tr. 207). Plaintiff was able to rotate and flex her hip without discomfort and Fabere's sign[5] was negative. (Tr. 207). A neurological examination of Plaintiff's lower limbs revealed that "sensation, strength, and reflexes are preserved." (Tr. 207). Straight leg raising was also negative. (Tr. 207). The doctor diagnosed Plaintiff with chronic back pain. (Tr. 207). Plaintiff was instructed to participate in physical therapy and was also "encouraged to remain active using good mechanics." (Tr. 205). Specifically, Dr. Ronan instructed Plaintiff to participate in "cardiovascular, strengthening exercises, as well as normal activities of daily living." (Tr. 205).

On July 9, 2006, Plaintiff participated in an MRI examination of her lumbar spine the results of which revealed degenerative changes at L3-4. (Tr. 201).

X-rays of Plaintiff's cervical spine, taken on December 20, 2007, revealed multilevel degenerative changes with no evidence of misalignment or significant neural foraminal encroachment. (Tr. 221). X-rays of Plaintiff's right shoulder, taken the same day, revealed degenerative changes with no evidence of fracture, dislocation, or acute traumatic osseous abnormalities. (Tr. 222).

---

[4] Trendelenburg's sign is designed to assess the strength of an individual's hip abductors. *See* Trendelenburg's Sign and Hip Abductor Exercises, available at: http://www.livestrong.com/article/425133-trendelenburgs-sign-and-hip-abductor-exercises/ (last visited on February 6, 2012). The test is performed in a standing position with your feet shoulder width apart. You then slowly lift one foot off the ground, balancing on your other foot. A positive test is when the hip of your non weight-bearing leg drops or is lower than the other side, indicating that the hip abductors on your weight-bearing leg are weak and cannot stabilize your pelvis. *Id.*

[5] Fabere's sign (also known as Patrick's test) is used to determine whether a patient suffers from arthritis of the hip joint. J.E. Schmidt, *Schmidt's Attorneys' Dictionary of Medicine* P-81 (Matthew Bender) (1996).

On January 15, 2008, Plaintiff was examined by Dr. Fett. (Tr. 223-24). Plaintiff reported that she was experiencing "discomfort in her neck and right shoulder." (Tr. 223). Plaintiff reported that her symptoms "are exacerbated by sitting, lying down, or driving," but that they are "reduced with neck stretching exercise." (Tr. 223). The results of a examination revealed the following:

> Evaluation of her neck demonstrates diffuse tenderness with palpation over her cervical spine and cervical paravertebral muscles. She has some restrictions in side-bending right and left, and rotation right and left, but flexion and extension of her neck are unremarkable, and not particularly painful. Cervical Spurling maneuvers are negative. Evaluation of her shoulders demonstrates no deformity, ecchymosis, or asymmetr[y]. She has full range of motion of both shoulders, but she does complain of discomfort in both shoulders with these motions. Palpation of her right shoulder demonstrates tenderness over both the anterior and posterior glenohumeral joint line, and over the right acromioclavicular joint. Impingement maneuver is negative bilaterally, supraspinatus maneuver demonstrates mild weakness bilaterally, but no severe pain. Sulcus sign and speed maneuvers are negative bilaterally. There is no glenohumeral crepitance with motion of either shoulder, and no gross instability of either shoulder is evident. Tinel's is negative at the cubital tunnels and carpal tunnels bilaterally, and reflexes are intact in both upper extremities. X-rays of her neck and right shoulder are available for review. Her right shoulder demonstrates degenerative changes at the acromioclavicular joint and marked degenerative changes at the glenohumeral joint. X-rays of her neck demonstrate degenerative disc disease at multiple levels, but in particular, at C4-5, C5-6, and C6-7, with spondylosis at these levels as well.

(Tr. 223-24).

The doctor "recommended that [Plaintiff] consider NSAIDs[6] for management of her discomfort." (Tr. 224). Dr. Fett further noted that Plaintiff "is not yet a candidate for a right shoulder replacement, her symptoms are fairly early, and she is still very functional." (Tr. 224).

On March 20, 2008, Plaintiff participated in a paraspinal EMG examination the results of which revealed that Plaintiff was experiencing varying degrees of muscle tension. (Tr. 227-32).

On June 19, 2008, Plaintiff was examined by Dr. Wahl. (Tr. 233). Plaintiff reported that she was experiencing pain in her neck and upper extremities. (Tr. 233). An examination of Plaintiff's head and neck was unremarkable. (Tr. 233). Lhermitte's sign[7] and Spurling's sign were both negative. (Tr. 233). Plaintiff exhibited "full strength throughout the upper and lower extremities without atrophy or fasciculation." (Tr. 233). Plaintiff participated in a nerve conduction study and an EMG examination the results of which revealed "minimal" electrical evidence of a median nerve dysfunction in the upper extremities and "no definite evidence" of polyneuropathy or radiculopathy of the upper extremities. (Tr. 233).

---

[6] NSAID refers to non-steroidal anti-inflammatory drugs which "are among the most common pain relief medicines in the world." *See* Pain Relief: How NSAIDs Work, available at http://arthritis.webmd.com/features/pain-relief-how-nsaids-work (last visited on February 7, 2012).

[7] Lhermitte's sign consists of twinges resembling a mild electrical shock felt in various parts of the body. It is observed in cases of multiple sclerosis and irritation and thickening of the membranes covering the brain and spinal cord, as well as other demyelinating diseases (i.e., diseases in which the myelin covering of nerves is lost). J.E. Schmidt, *Schmidt's Attorneys' Dictionary of Medicine* L-100 (Matthew Bender) (1996).

## **ANALYSIS OF THE ALJ'S DECISION**

The social security regulations articulate a five-step sequential process for evaluating disability. *See* 20 C.F.R. §§ 404.1520(a-f), 416.920(a-f).[8] If the Commissioner can make a dispositive finding at any point in the review, no further finding is required. *See* 20 C.F.R. §§ 404.1520(a), 416.920(a). The regulations also provide that if a claimant suffers from a nonexertional impairment as well as an exertional impairment, both are considered in determining her residual functional capacity. *See* 20 C.F.R. §§ 404.1545, 416.945.

The burden of establishing the right to benefits rests squarely on Plaintiff's shoulders, and she can satisfy her burden by demonstrating that her impairments are so severe that she is unable to perform her previous work, and cannot, considering her age, education, and work experience, perform any other substantial gainful employment existing in significant numbers in the national economy. *See* 42 U.S.C. § 423(d)(2)(A); *Cohen*, 964 F.2d at 528. While the burden of proof shifts to the Commissioner at step five of the sequential evaluation process, Plaintiff bears the burden of proof through step four of the procedure, the point at which her residual functioning capacity (RFC) is determined. *See Bowen v. Yuckert*, 482 U.S. 137, 146 n.5 (1987); *Walters v. Comm'r of Soc. Sec.*,

---

[8] 1. An individual who is working and engaging in substantial gainful activity will not be found to be "disabled" regardless of medical findings (20 C.F.R. 404.1520(b));

2. An individual who does not have a "severe impairment" will not be found "disabled" (20 C.F.R. 404.1520(c));

3. If an individual is not working and is suffering from a severe impairment which meets the duration requirement and which "meets or equals" a listed impairment in Appendix 1 of Subpart P of Regulations No. 4, a finding of "disabled" will be made without consideration of vocational factors (20 C.F.R. 404.1520(d));

4. If an individual is capable of performing work he or she has done in the past, a finding of "not disabled" must be made (20 C.F.R. 404.1520(e));

5. If an individual's impairment is so severe as to preclude the performance of past work, other factors including age, education, past work experience, and residual functional capacity must be considered to determine if other work can be performed (20 C.F.R. 404.1520(f)).

127 F.3d 525, 528 (6th Cir. 1997) (ALJ determines RFC at step four, at which point claimant bears the burden of proof).

The ALJ determined that Plaintiff suffered from: (1) early degenerative changes of the spine; (2) residuals of right carpal tunnel surgery; and (3) degenerative changes of the right shoulder, severe impairments that whether considered alone or in combination with other impairments, failed to satisfy the requirements of any impairment identified in the Listing of Impairments detailed in 20 C.F.R., Part 404, Subpart P, Appendix 1.  (Tr. 11-12).

With respect to Plaintiff's residual functional capacity, the ALJ determined that Plaintiff retained the capacity to perform work subject to the following limitations: (1) she can lift/carry 20 pounds occasionally and 10 pounds frequently; (2) during an 8-hour workday she can sit for six hours and stand and/or walk for six hours; (3) she can occasionally balance, stoop, kneel, crouch, crawl, and climb stairs, ramps, ropes, ladders, and scaffolds; (4) she can occasionally reach overhead with both upper extremities; and (5) she must avoid concentrated exposure to extreme cold, wetness and vibration.  (Tr. 12).

The ALJ determined that Plaintiff could not perform her past relevant work, at which point the burden of proof shifted to the Commissioner to establish by substantial evidence that a significant number of jobs exist in the national economy which Plaintiff could perform, her limitations notwithstanding.  See Richardson, 735 F.2d at 964.  While the ALJ is not required to question a vocational expert on this issue, "a finding supported by substantial evidence that a claimant has the vocational qualifications to perform <u>specific</u> jobs" is needed to meet the burden. *O'Banner v. Sec'y of Health and Human Services*, 587 F.2d 321, 323 (6th Cir. 1978) (emphasis added).  This standard requires more than mere intuition or conjecture by the ALJ that the claimant

can perform specific jobs in the national economy. *See Richardson*, 735 F.2d at 964. Accordingly, ALJs routinely question vocational experts in an attempt to determine whether there exist a significant number of jobs which a particular claimant can perform, his limitations notwithstanding. Such was the case here, as the ALJ questioned vocational expert Diana Wong.

The vocational expert testified that there existed approximately 574,000 jobs in the national economy which an individual with Plaintiff's RFC could perform, such limitations notwithstanding. (Tr. 37-38). This represents a significant number of jobs. *See Born v. Sec'y of Health and Human Services*, 923 F.2d 1168, 1174 (6th Cir. 1990); *Hall v. Bowen*, 837 F.2d 272, 274 (6th Cir. 1988); *Martin v. Commissioner of Social Security*, 170 Fed. Appx. 369, 374 (6th Cir., Mar. 1, 2006). The ALJ concluded, therefore, that Plaintiff was not entitled to benefits.

a.  The ALJ Properly Evaluated the Medical Evidence

Plaintiff first asserts that the ALJ erred by failing to afford controlling weight to the opinions expressed by Dr. Fett and Dr. Holman. The treating physician doctrine recognizes that medical professionals who have a long history of caring for a claimant and her maladies generally possess significant insight into her medical condition. *See Barker v. Shalala*, 40 F.3d 789, 794 (6th Cir. 1994). An ALJ must, therefore, "give the opinion of a treating source controlling weight if he finds the opinion 'well-supported by medically acceptable clinical and laboratory diagnostic techniques' and 'not inconsistent with the other substantial evidence in [the] case record.'" *Wilson v. Commissioner of Social Security*, 378 F.3d 541, 544 (6th Cir. 2004).

Such deference is appropriate, however, only where the particular opinion "is based upon sufficient medical data." *Miller v. Sec'y of Health and Human Services*, 1991 WL 229979 at

11

\*2 (6th Cir., Nov. 7, 1991) (citing *Shavers v. Sec'y of Health and Human Services*, 839 F.2d 232, 235 n.1 (6th Cir. 1987)).  The ALJ may reject the opinion of a treating physician where such is unsupported by the medical record, merely states a conclusion, or is contradicted by substantial medical evidence.  *See Cohen*, 964 F.2d at 528; *Miller v. Sec'y of Health and Human Services*, 1991 WL 229979 at \*2 (6th Cir., Nov. 7, 1991) (citing *Shavers v. Sec'y of Health and Human Services*, 839 F.2d 232, 235 n.1 (6th Cir. 1987)); *Cutlip v. Sec'y of Health and Human Services*, 25 F.3d 284, 286-87 (6th Cir. 1994).

If an ALJ accords less than controlling weight to a treating source's opinion, the ALJ must "give good reasons" for doing so.  *Wilson*, 378 F.3d at 544.  In articulating such reasons, the ALJ must consider the following factors: (1) length of the treatment relationship and frequency of the examination, (2) nature and extent of the treatment relationship, (3) supportability of the opinion, (4) consistency of the opinion with the record as a whole, (5) the specialization of the treating source, and (6) other relevant factors.  *See* 20 C.F.R. §§ 404.1527, 416.927; *see also*, *Wilson*, 378 F.3d at 544.  The ALJ is not required, however, to explicitly discuss each of these factors.  *See, e.g., Oldham v. Astrue*, 509 F.3d 1254, 1258 (10th Cir. 2007); *Undheim v. Barnhart*, 214 Fed. Appx. 448, 450 (5th Cir., Jan. 19, 2007).  Instead, the record must reflect that the ALJ considered those factors relevant to her assessment.  *See Oldham*, 509 F.3d at 1258; *Undheim*, 214 Fed. Appx. at 450.

While Plaintiff invokes the treating physician doctrine, she has failed to identify a single opinion from Dr. Fett or Dr. Holman to which the ALJ failed to properly defer.  Instead, Plaintiff merely asserts that the ALJ failed to recognize that "the basic tenor of the reports of [Dr. Fett and Dr. Holman] demonstrated that Plaintiff had significant physical limitations."  This argument completely ignores the fact that the ALJ discussed in detail the findings of Dr. Fett and

Dr. Holman and, as discussed above, concluded that Plaintiff, in fact, suffered from several severe impairments that impose on her significant functional limitations.

By invoking the treating physician doctrine but failing to identify any opinion to which the ALJ failed to accord sufficient deference, Plaintiff has forced the Court to divine from the administrative record the basis for this insufficiently developed argument. As a result of Plaintiff's failure to properly develop this argument, such is rejected. *See, e.g., Porzillo v. Department of Health and Human Services*, 369 Fed. Appx. 123, 132 (Fed. Cir., Mar. 12, 2010) (claimant "waves any arguments that are not developed"); *Shaw v. AAA Engineering & Drafting, Inc.*, 213 F.3d 519, 537 n.25 (10th Cir. 2000) (arguments "superficially" developed are waived); *Financial Resources Network, Inc. v. Brown & Brown, Inc.*, 2010 WL 4806902 at *30 n.29 (D. Mass., Nov. 18, 2010) (same). Moreover, as noted, the ALJ sufficiently addressed the treatment records from Dr. Fett and Dr. Holman and the ALJ's evaluation of such is supported by substantial evidence.

        b.      The ALJ's RFC Determination and Questioning of the Vocational Expert

As previously noted, the ALJ concluded that Plaintiff retained the ability to perform work activities, subject to the following limitations: (1) she can lift/carry 20 pounds occasionally and 10 pounds frequently; (2) during an 8-hour workday she can sit for six hours and stand and/or walk for six hours; (3) she can occasionally balance, stoop, kneel, crouch, crawl, and climb stairs, ramps, ropes, ladders, and scaffolds; (4) she can occasionally reach overhead with both upper extremities; and (5) she must avoid concentrated exposure to extreme cold, wetness and vibration. Plaintiff takes issue with the conclusion that she can occasionally climb ropes, ladders, and

scaffolds. Plaintiff also argues that testimony by the vocational expert establishes that there exist no jobs which she can perform consistent with her limitations.

The Court recognizes that it is certainly unusual for an ALJ to conclude that a claimant can occasionally climb ladders, ropes, and scaffolds. In light of the medical evidence of record, however, the Court finds that this conclusion, like the ALJ's RFC determination in toto, is nevertheless supported by substantial evidence. More importantly, however, even if the inclusion of such activities in the ALJ's RFC determination is in error, any such error is harmless.

In response to questioning by the ALJ, the vocational expert testified that Plaintiff, despite her limitations, could still perform work as a small products assembler and hand packager. In offering this testimony, the vocational expert specifically referenced and relied on the job descriptions articulated in the Dictionary of Occupational Titles (DOT) published by the United States Department of Labor. A review of the DOT makes clear that neither of the jobs in question, assembler (DOT number 706.684-022)[9] or packager (DOT number 920.587-018)[10] require a person to climb ropes, ladders, or scaffolds. Moreover, the vocational expert further testified that even if Plaintiff were unable to climb ladders, ropes, and scaffolds and was limited to sedentary work, there still existed more than 71,000 jobs in the national economy, a substantial number, which Plaintiff could perform. (Tr. 38-39).

Accordingly, the determination by the ALJ that Plaintiff can occasionally climb ladders, ropes, and scaffolds was, at most, harmless error which does not warrant relief. *See Heston*

---

[9] *See* United States Department of Labor, Office of Administrative Law Judges Law Library - Assembler, Small Products I, available at http://www.oalj.dol.gov/PUBLIC/DOT/REFERENCES/DOT07A.HTM (last visited on February 7, 2012).

[10] *See* United States Department of Labor, Office of Administrative Law Judges Law Library - Packager, Hand, available at http://www.oalj.dol.gov/PUBLIC/DOT/REFERENCES/DOT09A.HTM (last visited on February 7, 2012).

*v. Commissioner of Social Security*, 245 F.3d 528, 535-36 (6th Cir. 2001) (recognizing that remand to correct an error committed by the ALJ unnecessary where such error was harmless); *Fisher v. Bowen*, 869 F.2d 1055, 1057 (7th Cir. 1989) ("no principle of administrative law or common sense requires us to remand a case in quest of a perfect opinion unless there is reason to believe that the remand might lead to a different result"); *Berryhill v. Shalala*, 1993 WL 361792 at *7 (6th Cir., Sep. 16, 1993) ("the court will remand the case to the agency for further consideration only if 'the court is in substantial doubt whether the administrative agency would have made the same ultimate finding with the erroneous finding removed from the picture...'").

As for Plaintiff's argument that testimony by the vocational expert establishes that she is disabled, such is equally unavailing. In the exchange in question, Plaintiff asked the vocational expert to assume that Plaintiff suffered from the following limitations: (1) she can stand for no longer than 10 minutes at one time; (2) can lift no more than 5-10 pounds; and (3) must recline for 1-2 hours during an 8-hour workday. (Tr. 39). Not surprisingly, the vocational expert testified that if limited to such an extent there existed no jobs which Plaintiff could perform. (Tr. 39). The deficiency in Plaintiff's argument, however, is that the evidence of record lends no support to the argument that she is so severely limited. Thus, the ALJ correctly disregarded this particular testimony by the vocational expert.

**CONCLUSION**

For the reasons articulated herein, the undersigned concludes that the ALJ's decision adheres to the proper legal standards and is supported by substantial evidence. Accordingly, it is recommended that the Commissioner's decision be **affirmed**.

OBJECTIONS to this report and recommendation must be filed with the Clerk of Court within fourteen (14) days of the date of service of this notice. 28 U.S.C. § 636(b)(1)(C). Failure to file objections within such time waives the right to appeal the District Court's order. *See Thomas v. Arn*, 474 U.S. 140 (1985); *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981).

Respectfully submitted,

Date:  February 21, 2012          /s/ Ellen S. Carmody
                                  ELLEN S. CARMODY
                                  United States Magistrate Judge